J-S68029-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: D.R.P. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1097 WDA 2019 |

Appeal from the Decree Entered June 21, 2019
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
124 in Adoption 2018

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF R.Z-W.P. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.D., MOTHER | : | |
| | : | |
| | : | |
| | : | No. 1098 WDA 2019 |

Appeal from the Decree Entered June 21, 2019
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
124A in Adoption 2018

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: J.L.P. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: B.D., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1099 WDA 2019 |

Appeal from the Decree Entered June 21, 2019
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
124B in Adoption 2018

| | | |
|---|---|---|
| IN THE MATTER OF THE ADOPTION OF: E.R.P. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: B.D., MOTHER | : | |

:
:    No. 1100 WDA 2019
:

Appeal from the Decree Entered June 21, 2019
In the Court of Common Pleas of Erie County Orphans' Court at No(s):
124C in Adoption 2018

BEFORE:    GANTMAN, P.J.E., LAZARUS, J., and PELLEGRINI, J.[*]

MEMORANDUM BY LAZARUS, J.:      **FILED JANUARY 06, 2020**

B.D. (Mother) appeals from the trial court's decrees[1], entered in the Court of Common Pleas of Erie County, involuntarily terminating her parental rights to her four minor children, D.R.P. (born 6/2006), R.Z.-W.P. (born 1/2009), J.L.P. (born 5/2012) and E.R.P. (born 10/2015) (collectively, Children).[2] After careful review, we affirm.[3]

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Biological father, J.P., has filed a separate appeal from the court's decrees terminating his parental rights to Children. **See** 1094 EDA 2019, 1095 WDA 2019 & 1096 WDA 2019.

[2] The court appointed Attorney Christine Konzel as counsel to represent Children's legal interests in the contested termination matter. Attorney Alison Scarpitti was appointed as Children's guardian *ad litem*. **See** 23 Pa.C.S. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings) and **In re K.R.**, 200 A.3d 969 (Pa. Super. 2018) (en banc), **but see In Re: T.S., E.S.**, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests.").

[3] Erie County Office of Children & Youth (OCY) did not file a brief in the matter. However, OCY takes the position that "there is no discernible mistake of fact

- 2 -

Father is a truck driver who is on the road an average of five to seven days a week. Mother was a stay-at-home mother at the time of the termination hearings, who was in charge of Children while Father was working. In June 2017, while Father was in Florida for his job, D.R.P. told him in a phone call that Mother had smacked him on the back during an argument. Father called Erie County Office of Children & Youth (OCY) and relayed his concerns about Mother, the existence of deplorable conditions in the family home, and apparent domestic violence and Mother's mental health issues (diagnosis of bipolar disorder and clinical depression).[4] In response, OCY initiated family-based mental health services for the entire family. In July 2017, a caseworker had contact with Children who had indicated that they were fearful for their safety and had suffered injuries as a result of another physical altercation at home. On July 25, 2017, OCY sought protective custody of Children; the court subsequently adjudicated Children dependent and placed them in foster care. Mother admitted that she had physically abused Children, that Children reported they are fearful of her, that she had two children removed from her care over 20 years ago, and that she has a criminal history of aggravated assault and criminal conspiracy.

_____

or error of law committed by the trial court which would warrant reversal of its decision." OCY Letter, 11/18/19.

[4] Father also testified that he was advised by OCY to file a protection from abuse (PFA) petition against Mother to prevent Children from being taken away from him. N.T. Termination Hearing, 5/6/19, at 44-47. Father complied and filed the petition; however, he later withdrew the petition.

OCY formulated a dispositional plan for the family. Parents were to participate in random urinalysis testing, psychological evaluations, bonding assessments, mental health treatment, and advised to maintain safe and stable housing. The court granted Parents supervised visitation with Children. Father's visitation progressed to unsupervised for just two visits in June 2018, but returned to supervised in the summer of 2018 after OCY discovered that Father had been allowing Mother to have unauthorized and unsupervised contact with Children.

Jennifer Adams, a therapist with Parkside Psychological Associates, testified that she provided counseling with Mother's family beginning in late 2017/early 2018. N.T. Termination Hearing, 4/11/19, at 7-9. Adams focused on rapport building, assessment and treatment planning, and techniques for Parents to use to validate and support the Children. *Id.* at 9. Adams testified that D.R.P. had told her he witnessed violence between Mother and one of his brothers in the home, observed fights "that involved throwing things between [F]ather and [M]other," and reported that Mother had been physically abusive towards him. *Id.* at 19.

Doctor Peter Von Korff, an expert in the field of psychology and bonding assessments, testified that termination would be in Children's best interests. Doctor Von Korff, who conducted a psychological evaluation of Mother, concluded that she "has unmet needs for attention and gratification and emotional reward and carries often a lot of hostility about that, and that hostility sort of leaks out one way or another." *Id.* at 33. Doctor Von Korff

also opined that while Mother was open about her flaws, she was "equally closed to any idea of change or submission to authority," describing her as a "change-resistant [and] treatment-resistant person." *Id.* at 34. In addition, OCY Caseworker Lisa Langer testified that Parents seemed unwilling and resistant to working on the suggested family services. *Id.* at 94.

Father admitted to caseworkers numerous times that Mother was abusive toward the Children, and that he was not around to protect them because of his work schedule. *Id.* at 108. Caseworkers often observed Parents failing to intervene when Children were fighting amongst themselves. *Id.* at 111. Langer testified that Mother was also verbally abusive to Children, often calling D.R.P. a "fat a*s" and telling R.Z.-W.P. he had been switched at birth because he looked "like a Mexican." *Id.* at 100. Mother blamed OCY, in part, for Children being placed into protective custody, calling the caseworkers liars who acted upon unfounded allegations of abuse. N.T. Termination Hearing, 5/6/19, at 33-34.

In October 2018, OCY changed the goal from reunification to adoption. On November 27, 2018, OCY filed four petitions to involuntarily terminate Mother's parental rights to Children. The court held termination hearings on April 11, 2019 and May 6, 2019. After reviewing the evidence and testimony presented at the hearings, on June 21, 2019 the court issued decrees granting termination pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b).

Mother filed a timely notice of appeal and court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. She presents

the following issue for our consideration: "Did the [t]rial [c]ourt abuse its discretion in terminating [Mother's] parental rights when the record is comprised of insufficient competent evidence." Appellant's Brief, at 6.

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well[-]established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's decree is supported by competent evidence. *Id.*

Mother's argument section of her brief discusses the sufficiency of evidence, as it relates solely to termination under 23 Pa.C.S. § 2511(b). Thus, we confine our appellate review to this specific subsection of the Adoption Act.[5]

In *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013), our Supreme Court noted "if the grounds for termination under subsection (a) are met, a court 'shall

---

[5] 23 Pa.C.S. §§ 2101-2938.

give primary consideration to the developmental, physical and emotional needs and welfare of the child.'" 23 Pa.C.S. § 2511(b). Moreover, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of a child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005). Further, in *In re E.M.*, 620 A.2d 481 (Pa. 1993), this Court held that the determination of the child's "needs and welfare" requires an examination of "the status of the natural parental bond." *Id.* at 485. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d 781, 791 (Pa. Super. 2012), *overruled on other grounds by In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017).

Mother contends that Dr. Von Korff's observations about E.R.P.'s attachment issues had more to do with his age, "rather than the actions or inactions of [M]other." Appellant's Brief, at 11. Mother also asserts that where Dr. Von Korff testified that J.L.P. and R.Z.-W.P. had happy memories of their times with Parents, termination would have a negative effect on these children. Accordingly, she claims that the doctor's findings are flawed and should not have been relied upon by the trial court to terminate her parental rights under section 2511(b).

While Dr. Von Korff testified that some of the children had positive memories of Parents, he definitively testified that the attachment orientation between Mother and Children was insecure. N.T. Termination Hearing, 4/11/19, at 42. Doctor Von Korff also opined that Mother lacked "instrumental

care" in dealing with Children, failing to appropriately comfort or be sensitive to their needs. *Id.* at 49. D.N.P. also expressed a deep hostility towards Mother for her abusive behavior, which Dr. Von Korff testified was caused by a "pathological influence on him [by Mother]." *Id.* at 55. Finally, Dr. Von Korff opined that severing ties to Parents would be recommended where the family environment "as a whole was destructive to their attachment security and [the Children's] emotional well-being." *Id.* at 58.

In addition to Dr. Von Korff's testimony, caseworker Shannon Spiegel and OCY supervisor Julie Lafferty testified that due to Children's unhealthy bond with parents, terminating their parental rights would be in Children's best interests and that an adoptive resource was necessary for Children to live "healthy, happy, successful lives." *Id.* at 116, 123, 139.

After reviewing the parties' briefs, relevant case law and the certified record on appeal, we affirm the trial court's decrees terminating Mother's parental rights to Children on the basis of the trial court opinion authored by the Honorable Shad Connelly. Judge Connelly's opinion thoroughly analyzes the issue raised on appeal by Mother, supporting termination with reference to relevant testimony and evidence from the two-day hearing. Specifically, termination is proper under section 2511(b) where several OCY employees and Dr. Von Korff testified that termination would be in Children's best interests where Children need security and dependency which they have not been able to receive from Mother. Further, Children are thriving in their pre-adoptive homes and have positive attachments to their foster families. ***See***

*In re T.S.M.*, 71 A.3d 251, 268 (Pa. 2013) ("Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents.").

Accordingly, we discern no abuse of discretion or error of law by the trial court where its decrees are supported by competent evidence. *In re A.R.*, *supra*. We instruct the parties to attach a copy of Judge Connelly's opinion in the event of further proceedings in the matter.

Decrees affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/6/2020

- 9 -

IN THE MATTER OF
THE ADOPTION OF    :  IN THE COURT OF COMMON PLEAS
D.R.P., R.Z.-W.P., J. L P.,
AND E.R.P.       :  OF ERIE COUNTY, PENNSYLVANIA
           :  ORPHAN'S COURT DIVISION

APPEAL OF B.D.,     :  NO. 124, 124A, 124B, 124C OF 2018
Natural Mother

## 1925(a) OPINION

On June 21, 2019, an order was entered terminating the parental rights of the natural mother, B.D. to her children D.R.P., R.Z.-W.P., J.L.P. and E.R.P. The mother now challenges that order. A timely Notice of Appeal, and A Statement Pursuant to Pa. R.A.P. 1925 were filed by the B.D.'s counsel, Patrick W. Kelley, Esq. A review of the record supports the Court's determination that OCY presented sufficient clear and convincing evidence to terminate the mother's parental rights pursuant to 23 Pa. C.S.A. §§ 25111 (a)(1),(2),(5),(8), and is in the best interests of the children under 23 Pa. C.S.A.§ 2511(b). It is therefore requested the Superior Court affirm the order.

## PROCEDURAL HISTORY AND FACTS

D.R.P., born June 6, 2006; R.Z.-W.P., born January 27, 2009; J.L.P., born May, 8, 2012; and E.R.P., born October 12, 2015, are all children of B.D., natural mother, and J. P., natural father. The family had been living in North Carolina, but moved to Erie. In May, 2017, OCY received allegations that the mother had physically assaulted some of the children. The father filed a PFA Petition on behalf of the children against the mother that was eventually withdrawn. Services were opened with OCY in May, 2017, but ultimately, all four children were removed from the parents' care and placed in foster care. An Adjudication/Dispositional Hearing was held



FILED
SEP 16 2019
Register of Wills

1

on August 14, 2017 before this court. OCY had filed Dependency Petitions for the children. The parents stipulated that their children were without proper parental care or control based upon the following allegations:

1. The (parents have) a history with the Agency due to concerns of abuse, unstable housing, domestic violence, and lack of follow through with services. Furthermore, the families received with ongoing services since May, 2017 and (they) failed to alleviate the issues;

2. The (parents) have an extensive history in North Carolina due to concerns of physical abuse, neglect, deplorable home conditions, and drug and alcohol abuse. The cases in North Carolina were ultimately unfounded and closed by CYS.

3. The (parents) have failed and/or are unwilling to provide a safe and stable living environment. Furthermore, the home had an infestation of mice and bed bugs in May, 2017 and the conditions have since worsened resulting in the family being evicted.

4. The (parents) have failed and /or are unwilling to seek treatment for (their) mental health.

The mother additionally admitted:

5. (The mother) has previously had two children removed from her care over 20 years ago and successfully placed for adoption;

6. (The mother) has physically abused the minor (children). Furthermore, the (children) reported that (they are) fearful of (the mother) due to her hitting, scratching, pulling (their) hair, and throwing objects at (them);

7. (The mother) has a criminal history including Aggravated Assault and Criminal Conspiracy.

The father additionally admitted:

5. (The father) has failed to prevent physical abuse to the minor (children). Furthermore (the father) disclosed witnessing the abuse and neglect of his (children) on multiple occasions; however he has failed to protect the (children);

6. (The father) has failed to provide a safe and stable home for the minor (children). Furthermore, he continues to leave (the mother) in a caregiver role despite witnessing abusive behaviors.

Services had been extended to the family prior to the necessity of the children's removal and adjudication of dependency. Calls were received by OCY in May, 2017 alleging physical abuse to the children. Investigations determined the abuse was unfounded, but services were opened. Subsequently, J.P. filed a Protection From Abuse Act Petition on behalf of the children

2

against the mother, B.D. Prior to any action on the petition, the children were removed and the dependency actions begun. The court issued a Dependency/Dispositional Order on August 17, 2017, finding all 4 children dependent based upon the stipulated allegations of fact, and ordering the parents to be involved with a number of services. The goal was reunification of the family.

One of the main agencies involved with the family was Family Based Mental Health. Jessica Edmunds was the therapist assigned to the family. Edmunds began working with the family in June, 2017, and described the program as providing services in therapy, case management and crisis. The goals or problem areas being addressed with the family were: community- maintaining contact with all family service providers; family- boundaries and expectations and consequence with the parents, including anger management and parenting techniques; and individual - needs such as coping and communication skills.

Initially, J.P. and B.D., the parents, were together in sessions. However, their relationship during the sessions was deemed "too toxic" by Ms. Edmunds, meaning constant arguments, disagreements, an overall unhealthy atmosphere. Eventually, the joint sessions were terminated, and the parents were seen individually once they had split up. J.P. wanted one of his goals to be distancing himself from B.D. The father indicated on more than one occasion that he needed to distance himself from the mother. Despite the positive effort J.P. appeared to be giving with Ms. Edmunds' and the program, she found that he would normally take two steps forward, and then two back, Something would cause him to become upset and be more negative. . Although J.P. had stipulated to the finding of dependency of his children, he would tell Ms. Edmunds that the children shouldn't have been removed.

B.D. would participate in sessions and read the materials she was given. However, the mother disagreed with all the parenting techniques with which she was instructed. B.D. never

3

agreed with any of the materials she was given for the purpose of helping to raise her children. B.D. was terminated from the Family Based Mental Health program in July, 2018 because she was deemed not therapeutically appropriate as she refused to utilize the materials she was provided, and was surreptitiously recording therapy sessions.

The precipitating event which led to the termination of B.D. from the Family Based service occurred on June 19, 2018. The mother was having a supervised visit with the oldest child, D.P. Ms. Edmunds was supervising the visit and was observing it behind a one-way mirror at OCY. The child was not in a good mood, and the mother constantly pressed him as to what was wrong. D.P indicated that the mother wasn't working to get the children back, and mentioned abuse. This caused a very vocal and explosive disagreement. B.D. called her child a "liar", and rejected his feelings about the situation. D.P. started talking about past abuse and told his mother that if she ever hit him again, he would hit her back. Mom's response was that if he raised a hand to her, she would "beat his ass", and told him he was the reason she had lost her family. Ms. Edmunds had to intervene and had the child removed. One of the areas that Ms. Edmunds had been working on with B.D was appropriate ways to talk to children. It was another of the parenting techniques B.D. rejected, and resulted in the June 19th blow-up. After this visit, and the revelation about recording therapy sessions, B.D. was discontinued from Family Based Mental Health.

Shannon Spiegel of OCY was the family's caseworker beginning in December 2017. Throughout the Agency's involvement with B.D., the mother did not acknowledge any issue about her ability to care for the children or the reasons the children were in OCY's care. This attitude was in spite of B.D.'s admissions in August, 2017 of her abuse and inability to properly parent her children.

4

Although the plan through June, 2018 was to reunify the children with the father, who had split from B.D., he admitted to a "co-dependent relationship" with her, and that he could not get away from the mother; that she was a "drug" to him. Services were offered to J.P. to deal with this co-dependency issue, services he stated he wanted. OCY was going to increase unsupervised visits with the father one child at a time so as not to overwhelm him. The first weekend visit on the June 8, 2018 with D.P. went well. There were a number of discussions with the father that there was to be no unauthorized contact with the mother. Another weekend visit took place the following weekend, which happened to include Father's Day. At first, it appeared that visit had no issues. However an allegation was received on June 25th that the father had taken the child to the mother's house without permission, and that there was a plan to reunite with the children, then with mom, and move out of state. J.P. was confronted with this allegation. Initially the father said B.D. showed up at a friend's picnic unexpectedly where the dad and child were, and that he later left. Ms. Spiegel talked to D.P. later about how the visits were going. Ms. Spiegel learned that J.P. had taken D.P. over to the mother's residence, where the child spent the night. D.P. told Spiegel that he didn't want to go to his mother's on Father's Day, but he didn't want to disappoint his dad. D.P. had never been to the mother's residence, but was able to describe the layout, and said mom knew they were coming because they didn't have to break into the house. The father was confronted after Ms. Spiegel talked to D.P., and he admitted he allowed the child to have unsupervised, unauthorized contact with B.D. and let the child spend the night. Unfortunately, after this visit, D.P.'s behaviors escalated in the foster home, and he ultimately had to be removed. D.P. also had to be hospitalized for mental health reasons a little later in the summer. Jessica Edmunds stated there was a correlation between the visits with mom in June and the escalation in D.P.'s behaviors.

Shannon Spiegel concluded that despite the efforts of O.C.Y., Family Based Mental Health and other services, the ties between the mother and father were not being eliminated. J.P. had not alleviated any of his co-dependency with the mother, and failed to show the ability to care for himself, or care for his children. Despite the lengthy history of involvement with child protective agencies in multiple jurisdictions, the dad did not acknowledge or realize why his children were in care. J.P.'s relationship with OCY was turbulent at times. He would thank the Agency for intervening and helping him, and later accuse it of kidnapping children and selling them. J.P. did not consistently accept responsibility as to the reasons his children were adjudicated dependent. B.D. had been terminated from services by Family Based Mental Health after it was determined the mother was not involved with it on a therapeutic level, and she was recording sessions without permission.

Julie Lafferty, a supervisor at OCY, was involved in the case from its inception in July, 2017, and was Shannon Siegel's supervisor. Ms. Lafferty corroborated Spiegel's description of the father's attitude towards OCY. From J.P.'s allegations of kidnapping; taking children for cash; and illegally removing them and stealing them every day, to his contacting a state representative's office claiming his children were kidnapped, and his wife wasn't being given a chance to work for reunification, Lafferty concluded the circumstances of the children's placement had not been alleviated by the parents. Ms. Lafferty indicated she had received what she deemed as threats from the parents, and noted a post that B.D. had placed on Facebook entitled "Is it ethical to kill your CPS worker." *(4/11/2019 N.T. pp. 135, 138)*. Ms. Lafferty did not believe J.P. could protect the children from B.D., or that he would choose them over mom, because he and the mother had no desire to be apart, or give each other up. Neither parent has

6

any idea how their behaviors affect their children, and the children do not believe dad will protect them, but rather that he will get back together with the mother, once again putting them in harm's way.

J.P. admitted taking D.P. to see the mother; that he has discussed moving to North Carolina with the children, and that he still feels the children were prematurely removed. The father agreed that he stated his relationship with B.D. was like an addict relapsing, and that he is co-dependent with her. J.P acknowledged the children suffered from past abuse and trauma and that there was not a healthy relationship between the mother and children.

Peter von Korff, Ph.D., a licensed clinical psychologist , worked with all members of the family and had dozens of meetings with them. *(4/11/2019 N.T. pp. 28-29)*. Von Korff performed a bonding assessment of both parents. The instrument used for the bonding assessment was the Adult Attachment Interview, (AAI), which examined a person's general approach to close, intimate contacts. *Id. pp. 30-31*. The instrument used for the psychological evaluation was the MMPI-2. That test, containing 567 true/false questions, offers impressions of psychological adjustment. *Id.* The result of the AAI of B.D. had Dr. von Korff noting that the mother approached adult and parenting relationships in a fluid, self- contradictory manner. Dr. von Korff was not able to classify her according to the criteria of the AAI, which was an acceptable outcome. *Id.* The testing with the MMPI-2, revealed that B.D. had a histrionic tendency in her personality. She was driven for attention and had difficulty sustaining emotional calm in problem settings. According to Dr. von Korff, the mother had unmet needs for attention and gratification, and she carried a lot of hostility about that. *Id. p.33*. In addition, Dr. von Korff stated that B.D. was" uncommonly open about faults and flaws but closed to any idea of change or submission to authority." *Id. p.34*. Dr, von Korff characterized the mother as being change-resistant, head-

7

strong, bull-headed, and unpredictable. *Id. pp. 34-35.* Dr. von Korff concluded that the results of the testing predicted inconsistencies in B.D.'s way of functioning, meaning she would be sensitive to her children one moment, dismissive at another. The children would likely feel insecure in the mother/child relationship and be insecurely attached to the mother. *Id. p. 42*

The children were evaluated by Dr. von Korff, and that testing corroborated his findings concerning both parents. D.R.P. was viewed as looking for conventionality, stability, security, all things he felt he was not getting a chance to get. *Id. pp. 46-48.* R.Z.-W.P. had insecure avoidant orientation toward attachment; he was accustomed to substandard parental attention and support. The child saw his mother as lacking sensitivity, caring and a comforting nature. He learned to shut down on the part of life regarding the importance of dependency on parents. *Id. pp.48-49.*

J.L.P.'s evaluation gave the impression of an insecure attachment state of mind. The child was accustomed to substandard parenting, similar to R.Z. W.P., and looked at himself as functioning independently from his parents. *Id. pp. 50-51.* A different procedure was used for the youngest child, E.R.P., as he too young for standard testing to be used. He was placed in a room with B.D. The mother was instructed to leave, and not come right back even if the child started crying. . B.D. refused to follow that directive. When she left and the child started crying ,she came back. B.D. tried to comfort the child, but she could not. E.R.P. cried for "mama", and when his foster mother came in, she was able to comfort the child. This was evidence, according to Dr. von Korff, that this child was not secure with B.D. *Id. pp. 51-52* Dr. von Korff's conclusion as to all the children was that the parents were lesser figures in the attachment world than their foster parents. *Id. pp. 52-53.*

Dr. von Korff, in his analysis of the parents' treatment history, noted the parents were treatment resistant to all the reasonable treatment efforts made by the treatment agencies. *Id. p.*

8

*53.* J.P. was found to be co-dependent with the mother of the children, which Dr. von Korff deemed an "unusual way of relating." *Id. p. 53-54.* Dr. von Korff concluded that the children's environment with their parents was destructive to their attachment security and emotional well-being, characterizing the relationship as a "pathological family environment". Dr. von Korff opined that these children need secure, steady, dependable parenting, and if severing the parental bond accomplished that, he had no problem with that. *Id. p.58.*

Shannon Spiegel, the family's caseworker until October 2018, detailed the progress of the children in their respective placements.. The children had been able to foster healthy relationships, and were in places where they're safe and stable. Any bond the children had with their parents she characterized as unhealthy. Ms. Spiegel concluded that termination would best serve the needs and welfare of the children. *(4/11/2019 N.T. pp116, 123-124.).*

Previously in this opinion, it was noted that up until the June, 2018, the Agency had been pursuing a goal of potential reunification of the children with the father. That goal changed once the Agency became aware of the overnight visit J.P. permitted between the mother and D.R.P. Ms. Spiegel was asked why the Agency didn't give J.P. another chance when reunification had seemed so close. Spiegel viewed that decision by the father to allow the visit as a culmination of several incidents and with the father's history of not protecting the children, the decision was looked at as the final one in a string of poor decisions by J.P. *Id. p. 125.* The father admitted that the children had been abused and traumatized by the mother. B.D. Ms. Spiegel repeatedly told J.P., prior to his unsupervised visitation with D.R.P. in June, 2018, that there was to be no contact with the mother. The father's response was "do you think I'm stupid? I'm stupid but not that stupid." *Id. pp. 125,131-132.* This statement highlights the attempted deception J.P. was pursuing with OCY as to his relationship with B.D.

9

Julie Lafferty concurred with Ms. Spiegel's conclusion that termination of parental rights would best meet the needs and welfare of the children, and would not detrimentally impact them. *Id. p. 139.* Lafferty, who had supervised the case since its inception, noted that the children were all building healthy, happy, successful lives with healthy attachments in their placements. She was particularly gratified that D.R.P., although not in an adoptive placement, was doing exceptionally well. *Id. p. 140.*

Jessica Edmunds corroborated Lafferty's assessment of the children's adjustment. She had continued working with the three oldest children after the goal had been changed to adoption. At the time of the IVT, Edmunds was no longer working with R.Z.-W.P. or J.L.P. due to their increased positive behaviors. She was preparing to close out D.R.P. as well because of hie positive adjustment. Ms. Edmunds found significant improvement in the children since June, 2018. *Id. pp. 24-28.*

Rachel Campbell, the current caseworker for the children, is a permanency worker with OCY. Her job is to work with children whose goal is adoption or permanent legal custodianship,, and work towards establishing permanency for them. *Id. p. 141.* Ms. Campbell indicated E.R.P. and J.L.P. were together in an adoptive placement. J.L.P. was improving in school and in the home, and E.R.P. was doing excellent and very bonded to the family. *Id. pp. 141-142.* R.Z.-W.P. was also doing well in his adoptive placement. *Id.* D.R.P., although doing very well in his foster placement, was not in an adoptive resource, but the Agency was continuing to pursue options, including having D.R.P. and R.Z.-W.P. in the same adoptive placement. *Id. pp. 142-144.*

D.R.P, age 12, testified that he wanted contact with his dad, didn't want to be adopted but wanted to stay where he was at; and in the future, he would like his dad to take care of him, if he could separate from his (D.J.P.'s) mom. *(5/6/2019 N.T. pp. 3-5.).* This desire to have no contact

with the mother underscored the effects of the harm she had inflicted on all her children. The most telling evidence of B.D.'s attitude towards parenting and her children, specifically D.R.P., was her acknowledgement that D.R.P. didn't see her as a mother and they had often bumped heads. But, she said "he's a child, he believes he can run my house, tell me how to raise him. It's not going to happen that way, I am his mother." 5/6/2019 N.T. p. 33. It is very easy to predict that the abuse inflicted on D.R.P. by the mother awaited the three younger siblings if the mother was involved in their lives.

Hearings were held on the Agency's Petitions to Terminate the Parental Rights of B.D. to D.R.P., R.Z.-W.P., J.L.P. and E.R.P. on April 11, 2019 and May 6, 2019.[1] This Court reviewed the testimony and evidence presented at the Involuntary Termination Hearings., and issued Orders on June 21, 2019. The Agency presented sufficient clear and convincing evidence justifying the termination of the parental rights of B. D. to D.R.P., R.Z.-W.P., J.L.P. and E.R.P. pursuant to 23 Pa. C.S.§§ 2511 (a)(1),(2),(5) and (8), and that termination was in the best interests of those children under 23 Pa. C.S.§ 2511 (b).

## ISSUES PRESENTED

1. The Court's determination that grounds existed for terminating rights pursuant to 23 Pa. C.S.A. § 2511 (a) was based upon insufficient evidence and was therefore an abuse of discretion.

2. The Court's determination that termination of parental rights would serve the child's best interests was based upon insufficient evidence and was therefore an abuse of discretion.

---

[1] The approval of the change of goal by this Court was appealed by B.D. The Superior Court affirmed the change of goal by Opinion at 1604, 1605, 1606, and 1607 WDA 2018 on May 31, 2019.

11

## STANDARD OF REVIEW

In reviewing an appeal from an order terminating parental rights,

> Appellate courts must apply an abuse of discretion standard when considering a trial courts determination of a petition for parental rights. [The] standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T., 608 Pa. 9, 9 A.3d 1179, 1190 (2010).*
>
> If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.* An abuse of discretion does not result merely because the reviewing court might have reached a conclusion. *Id.* Instead, a decision may be reversed for an abuse of discretion only upon determination of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

## DISCUSSION

In a termination of parental rights hearing, the initial focus is on the conduct of the parent. The party moving for termination must "prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a)." *In re L.M., 923 A.2d 505, 511 (Pa. Super. 2007).* Once these statutory grounds exist, the court may analyze whether it is in the best interests of the child for parental rights to be terminated. *Id.*

The Agency proceeded to seek termination under the following grounds of Section 2511:

> (a)(1) the parent by conduct which has continued for a period of at least six (6) months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to the child, or has refused or failed to perform parental duties;
>
> (a)(2) the repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for the physical or mental well-being of said child and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent;
>
> (a)(5) the child has been removed from the care of the parent by the Court or under a voluntary agreement with an agency for a period of at least six (6) months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a

12

reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child;

(a)(8) the child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child;

(b) The termination of parental rights of J.P. to R.Z.-W.P., J.L.P., and E.R.P. is in the best interest of the children.

One major aspect of this analysis includes the "nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *Id.* The Superior Court may affirm the trial court's decision regarding the termination of parental rights with regard to any one subsection of 23 Pa. C.S.A. §2511(a). *In re B.L.W., 843 A.2d 380, 384 (Pa. Super. 2004) (en banc), app. den. 863 A.2d 1141 (2004).*

Preserving Appellant's parental rights is not an acceptable option in this case. "Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *In re B.N.M., 856 A.2d, 847, 855 (Pa. Super. 2004 ).* "A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *Id.*

The mother admitted a history of allegations of abusive behavior on her part extending back to when the family lived in North Carolina. In June, 2017, the father filed a Protection from Abuse Petition on behalf of the children against the mother. The Petition was dropped when OCY removed the children and filed dependency petitions based in a large degree

13

on the mother's abuse of the children. Both parents participated in therapy with Jessica Edmunds from Family Based Mental Health. The sessions started out as joint, but went to individual ones due to the "toxic" relationship between the parents involving arguments and fighting.

B.D., the mother, was afforded parenting education involving various techniques to care and deal with her children. These parenting sessions were also provided by Family Based Mental Health. Jessica Edmunds testified that throughout the involvement with the mother, from June 2017 to July 2018, the mother rejected any and all parenting suggestions she received from Family Based Mental Health.

On June 19, 2018, there was a supervised visit at OCY between B.D. and the oldest child, D.P. Ms. Edmunds observed the visit from outside the room, through a mirror. D.P. was in a bad mood that day and the mother kept pressing him as to what was wrong. Appropriate ways to talk to children was one of the topics covered in parenting education B.D. received, and rejected. The child began to get more agitated and told the mother she was not working hard enough to get the children back, then he talked about past abuse by the mother and said "if you hit me again, I'll hit you back. The mother responded that if D.P. raised a hand to her, "I'll beat your ass". The mother went on calling the child a liar, blamed him for the family being apart, and was screaming at him. This took place after a year of attempting to get the mother to acknowledge deficiencies in her childrearing and providing methods to correct those deficiencies; all of which B.D. rejected.

After this visit, it was revealed that the mother had been taping her sessions with Family Based Mental Health without permission. As a result of the disastrous visit and revelation of unauthorized recording, Family Based Mental Health in July, 2018, discontinued services to the mother due to her being therapeutically not appropriate and the surreptitious recording.

This evidence of the mother's attitude towards services and skills offered her corroborates Dr. von Korff's opinion of B.D. The mother's resistance to change and antagonism to authority has been repeatedly demonstrated over the history of this case. The insecurity observed in all the children related to the unpredictable nature of B.D.'s relationship with them has also been well-documented. Based upon these facts, the opinion of the workers involved with the children that termination would best meet their needs and welfare, and that the children would not be detrimentally impacted by the ending of the parental bond, is fully substantiated.

The history of this family throughout the years demonstrated the inability of the father to protect and parent his children. While living in North Carolina, child protective services got involved with the family due to allegations of abuse. Although those allegations were eventually deemed unfounded, services were opened. Little or no information is available regarding the cooperation of the family with North Carolina authorities. One need only look at what transpired once the family moves to Erie to conclude intervention was not particularly successful in North Carolina. J.P. files a Protection From Abuse Act Petition on behalf of his children alleging abuse by the mother, B.D. OCY gets involved and initiates services such as Family Based Mental Health with the family. The abuse allegations were ultimately unfounded, but despite a number of agencies' involvement, conditions in the home deteriorate to the extent that the children have to be removed. Both parents agree to the alleged facts that the children were living in unhealthy and unsafe conditions; the mother had abused them; the father did not protect the children while witnessing abuse at the hands of the mother; the parents were unwilling to seek mental health treatment; the parents did not provide a safe environment for the children, and these issues extended back to the family's time in North Carolina.

The parents had joint counselling with Jessica Edmunds. She found the sessions "toxic" with the constant fighting and disagreements between the parents. Once the parents split, each saw her individually. J.P. would make progress, but as Edmunds testified, he would take two steps forward, then two back. Something would trigger his anger with OCY, and the father would retreat to negativity. The mother rejected all suggestions regarding parenting techniques and how to relate to her children. Her rejection of proper parenting culminated in the "explosive" visit with her oldest child, D.P. on June 19, 2018, where she called him a "liar" and blamed him for the separation of the family. J.P., despite his apparent willingness to properly parent his children, consciously allowed D.P. to have an unauthorized overnight visit with B.D. The mother had shown no inclination to change her behaviors to provide safe and proper parenting for her children. The father had received services, training and therapy since June, 2017; had filed a PFA against the mother for abuse of her children: admitted witnessing the abuse; and admitted that the relationship between the children and their mother was troublesome. With all this acknowledged information about the mother, J.P. still permitted unsupervised, unauthorized visitation.

"Actions speak louder than words" is a better barometer of the father's alleviation of the circumstances which led to the children's removal and adjudication of dependency. J.P., while saying he appreciated OCY for providing services to help him to reunite with his family, would turn around and complain OCY kidnaps children, sells children, and did not give his wife a chance to rehabilitate herself. J.P. admittedly posted a number of items on Facebook during the period while the court was considering the change of goal. The first two posts from September 7, 2018 take delight in the fact that his wife disrupted the court hearing for over an hour. The September 14, 2018 post, and the September 23, 2018 post although only "shared" with Facebook friends, reveal the acceptance of sinister attitudes and actions which threaten the safety

16

of those charged with protecting the most vulnerable in our society. The deviousness underscores J.P.'s attempt to convince the court he was something he really wasn't – a parent ready to parent and protect his children. The admitted addictive relationship between himself and B.D. is the truth of this matter. He cannot break away from his wife, and will choose her over his children, even if this compromises their safety.

As previously noted, the standard of review of a trial court's determination to grant an involuntary termination of parental rights is abuse of discretion.

The Supreme Court has stated:

> "/W/e must defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan."

*In re R.J.T. 608 Pa. at 27, 9 A.3d at 1190.*

The mother has clearly shown that she has no desire to change her attitude toward parenting, no matter how much at risk it places her children. B.D. has been using abuse as a parenting technique for years, and has demonstrated she will not consider any change to her concept of parenting. "I am (the) mother."

R.Z.-W.P., J.L.P. and E.R.P. have thrived in their pre-adoptive placements, and D.R.P. has made it abundantly clear he wants no contact with B.D. The evidence demonstrated that severing contact with their parents, has not had any detrimental effect on the children. Not permitting these children to have to face the continued trauma and instability they have been through in their short lives is the paramount concern of this court.

B.D. has continuously demonstrated she cannot or will not place her children's needs above her own. She refuses to accept responsibility for her actions. The skills and judgment necessary to provide for the emotional well-being of her children are non-existent. The total

history of this case reveals that the mother is unable and unwilling to change to give priority to the needs for safety and adequate care for her children. She was given numerous opportunities to demonstrate she would work to be able to provide the necessary basic needs for her children and consistently failed to do so. The Agency has provided clear and convincing evidence supporting the Termination of B.D.'s parental rights to D.R.P., R.Z.-W.P., J.L.P. and E.R.P. pursuant to 23 Pa. C.S. §§ 2511 (a)(1),(2),(5), and (8); and that termination is in the best interests of those children. 23 Pa. C.S. § 2511(b).

## CONCLUSION

The mother B.D. has absolutely refused to accept any services and programs offered to her to remedy the conditions which led to the removal and placement of D.R.P., R.Z.-W.P., J.L.P. and E.R.P. The mother has shown that she cannot or will not remedy the conditions which led to the removal of her children. B.D. did not evidence any desire or ability to place her children's safety and well-being above her dangerous conception of parenting. There is no parental bond between mother and children. The best interests of D.R.P., R.Z.-W.P., J.L.P. and E.R.P. are best served by termination. It is requested that the Superior Court affirm this Court's Decree terminating the Appellant/mother's parental rights.

18

Dated this 16th day of September, 2019.

BY THE COURT

SHAD CONNELLY, SENIOR JUDGE

cc: Anthony Vendetti, Esq.
Erie County Office of Children and Youth
154 West 9th Street
Erie, PA 16501

Gregory J. Grasinger, Esq.
502 West 7th Street
Erie, PA. 16502

Christine Konzel, Esq.
305 West 6th Street
Erie, PA 16507

Alison Scarpitti, Esq.
150 East 8th Street, First Floor
Erie, PA 16501

Patrick W. Kelley, Esq.
254 West 6th Street
Erie, PA. 16507